UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

JOSEPH BONGIORNO,

                                      Plaintiff,                  1:19-cv-00423 (BKS/CFH)

v.

Police Officer CHRISTOPHER PERILLI in his individual capacity,[1]

                                      Defendant.

**Appearances:**

*For Plaintiff:*
Brian M. Dratch
Franzblau Dratch, P.C.
233 Broadway, Suite 1800
New York, New York 10279

*For Defendant:*
Louis U. Gasparini
Schwab & Gasparini, PLLC
222 Bloomingdale Road, Suite 200
White Plains, New York 10605

**Hon. Brenda K. Sannes, United States District Judge:**

MEMORANDUM-DECISION AND ORDER

**I.    INTRODUCTION**

        Plaintiff Joseph Bongiorno brings this action under 42 U.S.C. § 1983 alleging that Defendant subjected him to excessive force in violation of the Fourth Amendment. (Dkt. No. 2).[2]

---

[1] Plaintiff identified Defendant as "Christopher Pirelli" in the Complaint, but the Defendant's last name is "Perilli." (Dkt. No. 24-10, at 4). The Clerk is directed to correct the spelling on the docket.

[2] Plaintiff's Complaint included additional claims under the Fourteenth Amendment's Due Process Clause and Equal Protection Clause, 42 U.S.C. §§ 1981, 1985, and 1986, as well as claims against Officer Zachary Tanner. (Dkt. No. 2). These claims were dismissed through stipulation by the parties. (Dkt. Nos. 23, 30).

Defendant moves for summary judgment under Rule 56 of the Federal Rules of Civil Procedure on the grounds that Defendant's use of force was objectively reasonable in light of Plaintiff's attempt to escape and resisting arrest, and that Defendant is entitled to qualified immunity. (Dkt. No. 24-17). Plaintiff opposes Defendant's motion. (Dkt. No. 28-4). For the reasons discussed below, Defendant's motion is granted.

## II.   FACTS[3]

On September 22, 2017, a warrant was issued for Plaintiff's arrest on two counts of Criminal Sale of a Controlled Substance in the Third Degree, a Class B felony, in violation of N.Y. Penal Law § 220.39(1), and two counts of Criminal Possession of a Controlled Substance in the Third Degree, a Class B felony, in violation of N.Y. Penal Law § 220.16(1). (Dkt. No. 24-7, at 12). Defendant, a police officer with the Glens Falls Police Department, learned of the warrant for Plaintiff's arrest on the four drug counts through his position with the police department. (Dkt. No. 24-13, at 21). Defendant knew Plaintiff through his prior employment at a correctional facility, where Plaintiff had been incarcerated. (Dkt. No. 24-13, at 23).

On September 28, 2017, at approximately 7:05 p.m., Defendant spotted Plaintiff driving a white Toyota Sienna minivan "in the Elm and Exchange Street parking lot" in Glens Falls, New York. (Dkt. No. 24-16, ¶ 17). Defendant turned on his emergency lights and stopped Plaintiff in the parking lot. (*Id*. ¶ 18; Dkt. No. 24-13, at 33; Dkt. No. 24-12, at 25). Defendant approached the driver's side of the white Toyota Sienna and asked Plaintiff to step out of the vehicle, at which point he placed Plaintiff under arrest. (Dkt. No. 24-16, ¶ 20). Defendant handcuffed Plaintiff's hands behind his back and placed him in the rear of Defendant's patrol car. (*Id*.).

---

[3] The facts are drawn from Defendant's statement of material facts, (Dkt. No. 24-16), and attached exhibits, (Dkt. Nos. 24-7, 24-11, 24-13), and Plaintiff's response thereto, (Dkt. No. 28-3), and attached exhibits, (Dkt. Nos. 28-1, 28-2). The facts are construed in the light most favorable to Plaintiff. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

Defendant searched the interior of Plaintiff's car, assisted by Glens Falls Police Officer Zachary Tanner, and the officers found marijuana. (*Id*. ¶ 21).

While in the rear of Defendant's patrol car, Plaintiff caught Defendant's attention and Defendant stopped searching the car to approach Plaintiff. (Dkt. No. 24-16, ¶¶ 22-23; Dkt. No. 28-3, ¶ 22).[4] Plaintiff informed Defendant that the handcuffs were too tight, and Defendant allowed Plaintiff to get out of the patrol car so that Defendant could loosen them. (Dkt. No. 24-16, ¶ 23; Dkt. No. 28-3, ¶¶ 23-24). Defendant removed the left handcuff, and then "reapplied and double locked" the handcuff so that it "would not tighten up again." (Dkt. No. 24-16, ¶ 23).[5] Defendant then removed the handcuff from Plaintiff's right wrist. The parties dispute what happened next.

Defendant testified that after he removed the handcuff from Plaintiff's right wrist, Plaintiff ran away. (Dkt. No. 24-16, ¶ 24). Plaintiff ran north in the parking lot, away from the police car, with a handcuff on one hand while Defendant was holding onto the other handcuff. (Dkt. No. 24-13, at 55, 57). Plaintiff went "10 yards maybe," with Defendant holding onto one of the handcuffs before Defendant was able to stop him. (*Id.* at 56-57). Defendant never lost possession of that handcuff. (*Id*. at 57). Defendant took Plaintiff "down to the ground" after catching up with him. (*Id.* at 58). When Defendant was asked how he took Plaintiff to the ground, Defendant explained "I believe I grabbed his arm and I just - - we both went to the ground. I ran him down to the ground." (*Id.*). Defendant did not know whether Plaintiff's head struck the ground when he was brought to the ground. (*Id*. at 59). Defendant denies picking

---

[4] Defendant claims that Plaintiff "called over" to get his attention, and Plaintiff claims that "he was banging on the door of the police car." (Dkt. No. 24-16, ¶ 22; Dkt. No. 28-3, ¶ 22). This discrepancy is immaterial here.

[5] Defendant explained that when handcuffs are double locked, they will not get tighter or looser; handcuffs that are not double locked could become tighter if the arrestee "trie[d] to maneuver the handcuff." (Dkt. No. 24-13, at 55).

3

Plaintiff up to send him headfirst into the ground. (*Id*. at 58). Defendant testified that when they were both on the ground, Plaintiff initially "continued to resist," but that Plaintiff "started to comply" when Officer Tanner arrived. (Dkt. No. 24-13, at 60). In his police report, Defendant stated that when he caught up to Plaintiff, Plaintiff "continued to resist [Defendant's] efforts to be placed back into handcuffs by pulling and pushing away from [Defendant]," so Defendant "put [Plaintiff] on the ground where [Officer Tanner] assisted [him] with getting [Plaintiff] hand cuffed." (Dkt. No. 24-7, at 15).

Plaintiff testified that the patrol vehicle was "extremely hot," that the handcuffs were "severely tight," and that he "felt that he was going to die" if he stayed in the vehicle. (Dkt. No. 24-12, at 35). In a verified answer to interrogatories, Plaintiff asserted that "as the officer was loosening the handcuffs, plaintiff *leaned over due to disorientation* at which time the officer turned plaintiff upside down throwing plaintiff to the ground head first." (Dkt. No. 24-6, at 2) (emphasis added). During his deposition Plaintiff testified that once the handcuff was removed, he "walked away." (Dkt. No. 24-12, at 35, 39-40). In his deposition, Plaintiff denied that he tried to "sprint away" or "run away," and maintained that he "walked away." (Dkt. No. 24-12, at 40-46). Plaintiff agrees that he was attached to the handcuffs, and to Defendant, "the whole time." (Dkt. No. 24-12, at 39-40, 46; Dkt. No. 28-3, ¶ 26). Plaintiff testified that he never "went more than 2 feet," as he was still attached to the handcuff, and that Defendant "swung Plaintiff around and slammed Plaintiff down on his head." (*Id.* at 46). Plaintiff testified that he believed that he "was upside down and slammed on [his] head," and that Defendant did this by himself. (*Id.* at 53).[6] Plaintiff testified that he "was tackled" after he was slammed on his head. (*Id.* at 54).

---

[6] The police report indicates that Plaintiff is 5'11" and weighs 220 pounds. (Dkt. No. 24-7, at 1). The record does not reflect the size of the Defendant.

4

Plaintiff testified that, after he was slammed to the ground, he felt like his neck was broken. (*Id*. at 46-47). When questioned during his deposition about whether he continued to resist arrest, Plaintiff testified that he does not "really remember much" after being brought to the ground. (*Id.* at 8).

Officer Tanner testified that he became aware of this incident while he was searching Plaintiff's car. (Dkt. No. 24-14, at 32). Officer Tanner heard "what sounded like a scuffle in the distance," and when he went toward the area where he heard the "scuffle," he saw Plaintiff "actively resisting," with handcuffs "only attached to his left wrist," and Defendant "attempting to place [Plaintiff] in custody." (*Id.* at 32, 33). Officer Tanner did not see Defendant and Plaintiff go to the ground. (*Id.* at 34). Officer Tanner helped Defendant take Plaintiff into custody by taking Plaintiff's free arm and bringing it "behind his back to reattach the handcuff." (*Id.* at 34).

Defendant and Officer Tanner were both wearing body cameras. Defendant's body camera was knocked off during the struggle when Plaintiff began to run. (Dkt. No. 24-10, ¶ 9). The audio portion of that body camera, which had not been working prior to that point, began working when the body camera fell down. (Dkt. No. 24-10, ¶ 9; Dkt. No. 24-13, at 59).

The body cameras reflect the following.[7] (*See generally* Dkt. No. 25). At 7:25:40 p.m., while Tanner was standing by a patrol car, Defendant's voice can be heard in the background telling Plaintiff that he would "double lock [the handcuffs]" so they "won't tighten up." At 7:25:41 p.m., Defendant allowed Plaintiff to get out of the patrol car. Plaintiff got out of the vehicle, and turned with his back facing Defendant. Plaintiff's left arm was freed from the

---

[7] The Court has cited to the time stamps on the body camera footage, as converted from the 24-hour military time depicted on the recordings. There is no allegation or indication that the body camera recordings were doctored or altered in any way or that they depict anything different from what actually happened. The Court thus views the facts "in the light depicted by the videotape[s]." *Scott v. Harris*, 550 U.S. 372, 378-81 (2007); *Brown v. City of New York*, 798 F.3d 94, 104 (2d Cir. 2015 (Jacobs, *J*. dissent)).

5

handcuff at 7:25:59 p.m., and resecured at 7:26:09 p.m. Defendant then removed the right handcuff at 7:26:24 p.m. Seconds later, at 7:26:39 p.m., Plaintiff suddenly ran forward; the video shows Defendant continuing to hold onto Plaintiff by the left handcuff before Defendant's body camera was dislodged in the commotion at 7:26:41 p.m. Defendant's body camera then stopped recording video and the audio began to work. Also at 7:26:41 p.m., Tanner's body camera depicted him abruptly stopping the search of Plaintiff's vehicle and running to Plaintiff and Defendant.

At approximately 7:26:45 p.m., Plaintiff said "I'm not going nowhere," and Defendant's body camera recorded a response of, "You f…ing aren't." Although Tanner seemed to have stopped running and arrived at the scene at 7:26:46 p.m., his body camera only recorded muffled commotion between the time of Plaintiff's comment and 7:26:48 p.m., when both body cameras record Plaintiff being instructed to "turn over, turn over" and then to "turn the f… over." It was dark outside and Tanner's body camera footage is too dark and pixelated to make out any visible image until approximately 7:26:50 p.m. At that time the body camera depicts Plaintiff face down on the ground, and officers were instructing him to "turn over, turn over."

At 7:26:54 p.m., one of the officers said, "let me get his hand." At 7:26:58 p.m., Plaintiff said that he "can't breathe" and that he has a "heart problem." At 7:27:04 p.m., Plaintiff was directed not to resist and told to roll over onto his stomach. At 7:27:10 p.m., Plaintiff is visibly handcuffed. Plaintiff was assisted into a standing position at 7:27:21 p.m., and he returned to the back of a patrol car at 7:28:12 p.m.

Neither of the body cameras depict how Plaintiff was brought to the ground. Defendant's body camera was dislodged at 7:26:41 p.m., when Defendant was pulled along with Plaintiff's

6

attempt to run, and the first discernable image of Plaintiff in Tanner's body camera depicts Plaintiff on the ground, and being instructed to turn over, at approximately 7:26:50 p.m.

Plaintiff was taken to the Glens Falls Police Department, and from there was transported to Glens Falls Hospital via ambulance. (Dkt. No. 24-7, at 22). At the hospital, Plaintiff was observed as being "barely [able to] raise his legs off the stretcher" and it was assumed Plaintiff "could have a spinal cord injury." (Dkt. No. 28-1, at 4). Plaintiff was transferred to Albany Medical Center on September 29, 2017, where he was admitted. (*Id*.; Dkt. No. 28-2, at 1). Albany Medical Center indicated that Plaintiff had "probable cord compression C5, C6, C7 cord contusion" and a "radial head fracture" to his left arm. (Dkt. No. 28-2, at 1; Dkt. No. 28-4, at 1). The medical records indicate that Plaintiff was "involved in an assault" and "tackled and hit [his] head," but there is no indication of who provided this information to the doctors. (*Id.* at 2). Plaintiff was prescribed a "Miami J collar" to be worn at all times for the "cord compression." (*Id*. at 2). For the "left radial head fracture," Plaintiff's "left upper extremity" was splinted and he was instructed to maintain "nonweightbearing" with the left extremity. (*Id*.). Plaintiff was discharged on October 2, 2017. (*Id.* at 3). Plaintiff testified that he has headaches, dizzy spells, and vertigo, and that he sees a doctor at the prison "quite often" "for everything that happened to [him]" during this incident. (Dkt. No. 24-12, at 9, 18). He recently saw a neurologist who wants him to undergo testing. (*Id.* at 63-64).

In connection with this incident, Plaintiff was charged with attempted escape, first degree, a Class E felony in violation of N.Y. Penal Law § 205.15(2), and misdemeanor resisting arrest in violation of N.Y. Penal Law §205.30. (Dkt. No. 24-7, at 13; Dkt. No. 24-11, at 3-4). On February 13, 2018, Plaintiff appeared in Warren County Court and pled guilty to the four drug

felony counts that were the subject of his arrest, as well as the attempted escape and resisting arrest charges. (Dkt. No. 24-11, at 1-19).

### III. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).

IV.  DISCUSSION

    A.  **Plaintiff's Guilty Plea to Attempted Escape and Resisting Arrest**

During the plea colloquy regarding the attempted escape charge, the court asked Plaintiff, "Did you . . . attempt to escape police custody by pulling your arms away from the police and attempting to run away," and Plaintiff responded, "Yes." (Dkt. No. 24-11, at 25). With respect to the resisting arrest charge, the court asked Plaintiff, "Did you attempt by your actions to prevent the police officers from taking you into custody or arresting you," and Plaintiff responded, "Yes." (*Id.* at 26). When the court asked, "in what manner did you attempt to prevent your arrest," Plaintiff responded, "I pulled my arm away and I attempted to run." (*Id.*).

The parties disagree on the significance of Plaintiff's guilty pleas. Defendant argues that because Plaintiff pled guilty to attempting to escape police custody and resisting arrest, and testified under oath to committing both offenses during his plea colloquy in criminal court, Plaintiff is "judicially estopped" from denying that he attempted to escape or resisted arrest, (Dkt. No. 24-17, at 16). Seeming to misconstrue Defendant's argument, Plaintiff responds that neither guilty plea bars an excessive force claim. (Dkt. No. 28-4, at 5).

"A claim of excessive force would not be precluded by the plaintiff's prior convictions for resisting arrest . . . unless facts actually determined in his criminal conviction that were necessary to the judgment of conviction are incompatible with the claim of excessive force raised in the subsequent civil suit." *Sullivan v. Gagnier,* 225 F.3d 161, 166 (2d Cir. 2000). Defendant has not argued, and the Court does not find, that Plaintiff's guilty pleas to attempting to escape from police custody and resisting arrest by pulling his arm away and attempting to run, preclude a claim for excessive force following that conduct. Plaintiff is, however, estopped from denying his admission that he attempted to flee and resisted arrest by pulling his arm away and attempting

9

to run. *Smith v. Sawyer*, 435 F. Supp. 3d 417, 432-33 (N.D.N.Y. 2020); *Rolkiewicz v. City of New York*, 442 F. Supp. 3d 627, 639 (S.D.N.Y. 2020).

### B.     Applicable Law

#### 1.     Excessive Force

The Supreme Court has held that "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989). Whether the force used by an arresting officer was excessive is determined by an objective balancing test where "the nature and quality of the intrusion on the plaintiff's Fourth Amendment interests" is balanced "against the countervailing governmental interests at stake." *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010). At least three factors guide the determination: "(1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Id.* "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Moreover, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396-97. "Given the fact-specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123 (2d Cir. 2004).

### 2. Qualified Immunity

"Qualified immunity protects public officials from liability for civil damages when one of two conditions is satisfied: (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015) (quoting *Russo v. City of Bridgeport*, 479 F.3d 196, 211 (2d Cir. 2007)); *see also generally Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Hurd v. Fredenburgh*, 984 F.3d 1075, 1089 (2d Cir. 2021) (quoting *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 433 (2d Cir. 2009)).

### C. Analysis

Defendant argues that Plaintiff's excessive force claim must be dismissed because his actions were objectively reasonable in light of Plaintiff's attempted escape and resisting arrest. (Dkt. No. 24-17, at 12-19). Plaintiff argues that material issues of fact preclude the Court from determining that Defendant's use of force was not unreasonable. (Dkt. No. 38-4, at 4).

Plaintiff's excessive force claim is based upon Defendant's conduct in taking Plaintiff to the ground. (Dkt. No. 28-4).[8] As an initial matter, in light of Plaintiff's admissions in connection with his guilty pleas and the body camera footage, the Court does not credit Plaintiff's assertions

---

[8] Plaintiff has not argued that Defendant used excessive force after taking Plaintiff to the ground and, in any event, he has failed to raise a triable issue of fact as to any excessive force after he was taken to the ground. Plaintiff did not recall whether he was resisting the officers while on the ground (Dkt. No. 24-12, at 8); Officer Tanner testified that he saw Plaintiff "actively resisting," and that he helped Defendant take Plaintiff into custody by taking Plaintiff's free arm and bringing it "behind his back to reattach the handcuff." (Dkt. No. 24-14, 34). In any event, even viewing these facts in the light most favorable to Plaintiff, Plaintiff has not identified any specific act that could constitute excessive force while he was laying on the ground. Plaintiff did testify that, after he was re-handcuffed, the officers "threw him" into the car, but did not elaborate further. (Dkt. No. 24-12, at 47, 52). Contrary to Plaintiff's testimony, the body camera footage reflects that Plaintiff lowered himself into the patrol car at 7:28:12 p.m., after one of the officers instructed Plaintiff to "sit down" in the patrol car. (Dkt. No. 25).

11

that Defendant took him to the ground after Plaintiff "leaned over due to disorientation" or after Plaintiff "walked away." (Dkt. No. 24-6, at 2; Dkt. No. 24-12, at 39). Plaintiff is estopped from denying his admission, in his guilty pleas, that he attempted to flee and resisted arrest by pulling his arm away and attempting to run. That is what is depicted on Defendant's body camera.

It is not clear exactly how Defendant took Plaintiff to the ground. Plaintiff initially testified that Defendant "swung me around and slammed me down on my head." (Dkt. No. 24-12, at 46). When questioned about an earlier allegation that Defendant "picked Plaintiff up and tossed him to the ground upside down," Plaintiff testified that Defendant "swung me by the handcuffs and slammed me down on my head, however he did it. . . I believe I was upside-down and slammed on my head." (*Id.* at 50, 53). Defendant asserts that he "grabbed [Plaintiff's] arm" and he "ran him down to the ground." (Dkt. No. 24-13, at 58). In any event, construing the facts in the light most favorable to Plaintiff, for the purposes of this decision, the Court assumes that Defendant brought Plaintiff to the ground in a manner in which Plaintiff was slammed down on his head, and possibly upside down.

However, even construing the facts in the light most favorable to the Plaintiff, a reasonable juror could not find that Defendant's use of force in taking Plaintiff to the ground was unreasonable under the circumstances here, considering the factors articulated in *Tracy*. *See Tracy*, 623 F.3d at 96.

First, with respect to the severity of the crimes, Plaintiff was arrested on an outstanding arrest warrant for four felony drug counts: two counts of criminal sale of a controlled substance in the third degree and two counts of criminal possession of a controlled substance in the third degree, (Dkt. No. 24-7, at 12)—all Class B felonies. *See* N.Y. Penal L. §§ 220.39, 220.16. Although these crimes do not involve violence, they are serious felonies, the conviction of which

requires a determinate term of imprisonment of at least one year and not more than nine years. *See* N.Y. Penal Law § 70.70(2)(a)(i); *cf. Depalma v. New York*, No. 14-cv-0058, 2016 WL 1305972, at *4, 2016 U.S. Dist. LEXIS 42903, at *10-11 (N.D.N.Y. March 31, 2016) (considering excessive force claim in connection with an arrest for two Class D felonies, which carry a maximum sentence of thirty months, as well as a misdemeanor drug charge, and resisting arrest, the court found "that the severity of the crime does not favor a finding that the force was unreasonable").

Given Plaintiff's sudden attempt to flee in a public parking lot from a police officer who was alone at the time,[9] Defendant could not realistically prevent Plaintiff's escape without using some amount of force. And, the events happened quickly. Plaintiff's sudden, unexpected move to escape forced Defendant to make a quick decision regarding the amount of force necessary in order to subdue and secure Plaintiff. *See Graham*, 490 U.S. at 396-97 (reasonableness calculus "must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation").

The fact that Plaintiff attempted to escape justified some degree of force to effect his arrest and to prevent his escape from custody. *See Sullivan*, 225 F.3d 161, 165-66 (2d Cir. 2000) ("The fact that a person whom a police officer attempts to arrest resists . . . no doubt justifies the officer's use of some degree of force[.]"); *Tracy*, 623 F.3d at 98 (finding that officer's use of force was reasonable where he tackled a fleeing suspect to the ground, resulting in a broken hip that required surgery); *see* Dkt. No. 24-8, at 5 (Glens Falls Police Department Use of Force &

---

[9] The parties dispute whether Tanner had arrived by the time of the takedown. Plaintiff claims that Officer Tanner was present; Tanner testified that he did not see the takedown. (Dkt. No. 24-12, at 50; Dkt. No. 24-14, at 34). Construing the facts in the light most favorable to Plaintiff, the Court assumes that Tanner had arrived by the time Defendant took Plaintiff to the ground. There is, however, no dispute that Defendant was the only officer involved in the takedown.

13

Deadly Force Policy describes "forcing a suspect down on the floor" as one of the appropriate "compliance techniques" for a suspect "perceived by the officer to be actively resistant").[10] At the same time, Plaintiff's attempt to escape did "not give the officer license to use force without limit." *Sullivan*, 225 F.3d at 166. When a suspect resists arrest, "[t]he force used by the officer must be reasonably related to the nature of the resistance and the force used, threatened, or reasonably perceived to be threatened, against the officer." *Id*.

A police officer "must be entitled to make a reasonable selection among alternative techniques for making an arrest." *Brown v. City of New York*, 798 F.3d 94, 103 (2d Cir. 2015). Here it was objectively reasonable for Defendant to believe that urgent and forcible action was necessary to prevent Plaintiff's escape and to effect the arrest, and reasonable for Defendant to decide to take Plaintiff to the ground. The question, then, is whether a jury could find that the manner in which Defendant took Plaintiff to the ground was excessive. Plaintiff alleges that he was brought to the ground with such force that he suffered "a radial head fracture to his left arm as well as cord compression to his cervical spine at three levels." (Dkt. No. 28-4, at 1). These alleged injuries are undoubtably serious and, crediting Plaintiff's account, Defendant did nothing to control the takedown to minimize potential injury: Plaintiff was slammed on his head.

However, the Court finds that under the circumstances the Defendant confronted here— attempting to prevent the escape, and effect the arrest, of the 220-pound Plaintiff while holding onto one handcuff attached to Plaintiff's left wrist in a parking lot after Plaintiff made a sudden

---

[10] The use of force policy notes that "there is no way to specify the exact amount or type of reasonable force to be applied in any situation." (Dkt. No. 28-8, at 1). The policy lists a number of factors that "should be taken into consideration" in evaluating whether an officer has used reasonable force including, inter alia, "[t]he conduct of the individual being confronted," "[t]ime and circumstances permitting, the availability of other options (what resources are reasonable available to the officer under the circumstances)," and "risk of escape." (*Id.*, at 4). The policy describes "takedown" techniques for suspects perceived to be actively resisting as "[t]echniques that redirect a suspect to the ground in a controlled manner to limit physical resistance and to facilitate the application of a restraint device, and to prevent intentional injury to the suspect." (Dkt. No. 24-8, at 6-7).

14

attempt to run—no reasonable jury could find that the Defendant's failure to control the takedown was unreasonable. In *Flanigan v. Town of Colchester*, 171 F. Supp. 2d 361, 366 (D. Vt. 2001), for example, the district court granted summary judgment to an officer who took a plaintiff to the ground, allegedly fracturing a right orbit bone when the plaintiff's face hit the ground, after the plaintiff evaded the officer's attempts to handcuff him and took a few steps toward the plaintiff's house. The officer in *Flanigan* knocked the plaintiff's "feet out from under him, grabbed him around the chest and forced him to the ground." 171 F. Supp. 2d at 365. While the district court cited to the seriousness of a fractured right orbit bone, the court noted that it was "not a surprising result of a reasonable police response to [the plaintiff's] conduct." *See also Brayshaw v. City of Burlington*, No. 13-cv-253, 2015 WL 1523019, at *2, 12, 2015 U.S. Dist. LEXIS 44034, at *5, 32 (D. Vt. Apr. 3, 2015) (granting summary judgment to police officer whose "imperfect arm bar takedown," without controlling the plaintiff's fall, caused the plaintiff's "head to hit the pavement" resulting in "fractures to his left orbit bone, frontal and ethmoid sinus, teeth, and right occipital condyle, as well as pneumocephalus," after the plaintiff resisted the officer's escort away from an area where the plaintiff had engaged in disorderly conduct, and swung his free arm in a way that he could potentially strike the officer); *McKenzie v. City of New York*, No. 18-cv-6913, 2021 U.S. Dist. LEXIS 39116, at *10-11 (S.D.N.Y. Feb. 26, 2021) (finding it objectively reasonable for police officer to "slam" the plaintiff to the stairs after the plaintiff, who was stopped for a misdemeanor sex offense, ran from officers attempting to evade arrest); *Williams v. Dzoba*, No. 09-cv-6355, 2014 WL 2926506 at *4-5, 2014 U.S. Dist. LEXIS 87489, at *10-12 (D.N.J. June 26, 2014) (ruling that reasonable jury could not find that officer's take down of suspect who had fled was excessive when officer effected the arrest by

"put[ing] [the plaintiff] in a hammerlock and flip[ping] him over on the ground – fairly standard procedure for a forcible arrest").

Plaintiff argues that there are material issues of fact "due to the circumstances of Plaintiff's state of mind," because he had been "suffering from excessive heat" in the back seat of Defendant's vehicle with "no ventilation." (Dkt. No. 28-4, at 5). Plaintiff testified that he complained to Defendant about the heat inside of the patrol car, and that he was "disoriented from the heat and all the commotion." (Dkt. No. 24-12, at 35-36, 39). Plaintiff argues that he "attempted to walk away," "in a state of confusion, and fearing for his safety and life having to return" to the police car. (*Id.* at 6). Plaintiff is estopped from denying that he attempted to flee and resisted arrest by pulling his arm away and attempting to run. Moreover, the relevant inquiry is the objective reasonableness of the Defendant's actions, not the Plaintiff's state of mind. *See Graham*, 490 U.S. at 396 ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."); *Salim v. Proulx*, 93 F.3d 86, 92 (2d Cir. 1996) ("The reasonableness inquiry depends only upon the officer's knowledge of circumstances immediately prior to and at the moment that he made the split-second decision to employ deadly force."). While the Court credits Plaintiff's allegations that he complained to Defendant about the heat, Plaintiff's attempt to escape warranted some force in response. *Tracy*, 623 F.3d at 97. And even construing the facts in the light most favorable to Plaintiff, given the "tense, uncertain and rapidly evolving" situation that Plaintiff created by attempting to run from the Defendant in a public parking lot, no rational factfinder could find that Defendant's takedown was unreasonable. *Graham*, 490 U.S. at 397.

16

Even assuming Defendant's use of force was excessive, the Court finds that Defendant is entitled to qualified immunity because a reasonable police officer could have believed that the Defendant's takedown of Plaintiff was a permissible response to the Plaintiff's attempt to escape.

## V.   CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 24) is **GRANTED**; and it is further

**ORDERED** that the Complaint (Dkt. No. 2) is **DISMISSED** in its entirety; and it is further

**ORDERED** that the Court Clerk is directed to close this case.

**IT IS SO ORDERED.**

Dated: May 7, 2021
Syracuse, New York

*/s/ Brenda K. Sannes*
Brenda K. Sannes
U.S. District Judge